THE MISSOURI PACIFIC RAILWAY COMPANY V. F. M. McCALLY, *as Administrator of the estate of Dexter F. McCally, deceased.*

*Motion for Rehearing.*

THE facts are stated in *Mo. Pac. Rly. Co. v. McCally,* just decided, and in the opinion herein, filed on May 10, 1889.

*Per Curiam:* A motion has been filed for a rehearing of this case, and for a reconsideration of the matters heretofore presented. It is urged that the opinion ignores several vital, important and controlling questions contained in the record and discussed in the original briefs. The matters most forcibly presented in support of the rehearing refer to testimony of certain witnesses concerning conversations had between themselves and Henry Snyder, the engineer, after the accident occurred, and the testimony of James Calloway, that in his opinion the pilot of the engine was the proper place for Dexter F. McCally to be at the time of the accident. The statements of Snyder after the accident were incompetent, being hearsay testimony only. (*Rly. Co. v. Pointer,* 9 Kas. 620.) The only statements or conversations with Snyder which in any way tended to prove that he was negligent in running or operating the train were as follows. James Calloway testified:

"Q. What did you do in the way of calling or shouting for Snyder? A. I hallooed to him to look out — that we were going to strike.

"Q. Did you shout in a loud voice? A. Yes, sir.

"Q. Do you know whether he heard you or not? A. I do not know. *He said he heard somebody halloo.*

"Q. Did you have any conversation with Snyder at the time of the accident or immediately after as to why he did not stop the engine, or why he drove it so fast, or on any other subject? A. I asked him what in hell he wanted to do — did he want to kill us all? and he said he couldn't help it.

"Q. Did he say anything further? A. He said he didn't think we were so near the coal cars; he claimed the smoke

was down on his side of the cab, and the snow blowing so he couldn't see.

"Q. Did he say anything about hearing your cries and shouts? A. He said he heard somebody hallooing, but he didn't know what it was.

"Q. How long after the collision was it? A. Just after, as soon as I got up and walked to the engine."

Again, W. T. Harrell testified:

"Q. Did Snyder say anything as to whether he saw Calloway making the signals? A. He said he didn't see him; that is what he said; he said he didn't see any signals.

"Q. When did he tell you that? A. Right after it happened.

"Q. How long after the collision? A. A couple of hours; he talked right along while he was helping to put the engine on."

Unless it can be said from the record that this incompetent testimony was not prejudicial to the rights of the railway company, its admission would cause a reversal of the judgment. We think, however, that an examination of the whole record shows that this testimony was not prejudicial or injurious. In the case of *Railway Co. v. Pointer*, supra, the hearsay testimony of Hamilton, the engineer, which occurred after the accident, was introduced by Pointer to show the negligence of Hamilton in running his train, after Pointer had called Hamilton as a witness to testify in his behalf. Hamilton's attention was not called to such conversation when on the stand. In this case Snyder was a witness produced by the railway company; and although the objectionable testimony was not offered as evidence to impeach him, yet he had full opportunity to deny the statements attributed, and he made as a witness, full and complete denial thereof. But, further than this, the evidence of Snyder clearly established his negligence in the running or operating of his engine. He testified among other things as follows:

"Q. You may state what you were engaged in doing that morning. A. I got the engine out of the round-house, and the brakemen helped me.

"Q. Did you get it out for the purpose of switching in the yard—shifting cars from one track to another? A. Yes, sir.

"Q. In that business who was to assist you that morning as brakemen? A. Calloway and McCally.

"Q. When you go out in the yard to do switching, do you give them (brakemen) orders to do a certain thing, or do you go for the purpose of following signals? A. I go for the purpose of switching, and I don't know what is to be done until I go out; sometimes I do, and sometimes I don't.

"Q. Do you at all times follow the signals of the brakemen? A. Yes, sir.

"Q. Then the movement of the engine is in accordance with the signals given by the brakemen who are assisting in switching? A. Yes, sir.

"Q. Which side of the cab is your position in as engineer? A. The right-hand side.

"Q. The fireman, then, occupies the left-hand side? A. Yes.

"Q. You may state what the condition of the road was at the time. A. It was snowing hard, and there was probably three inches of snow on the track and all over the ground; the snow was terribly light, and it was blowing every way.

"Q. Was the wind blowing hard at the time? A. Yes, sir.

"Q. What direction was it blowing from? A. Nearly from the north, and a little from the northeast.

"Q. Were the rails wet and slick? A. Yes, sir.

"Q. State if there was anything else besides the box car that prevented you from seeing ahead of the engine along the road. A. Yes, sir; I could not see the box car hardly any of the time, on account of the smoke and the snow blowing from the engine and the top of the box car against the cab windows.

"Q. When the coupling to the box car was made, where did the brakemen take their positions, if you know? A. I never saw but one of them; that was the one on top of the car.

"Q. Who was that? A. Calloway.

"Q. When Calloway got on top of the car what did you do? A. He gave me the signal to go ahead, and I pulled her open and went ahead."

He was subsequently asked if he saw any signal after that from the top of the box car. He answered: "No, sir, I did

42—41 KAS.

not see any signal; the only signal I got was from the fireman."

"Q. At what rate of speed did you pass over the track from where you coupled on the box car to the point where you crossed the highway? A. In my judgment, I don't think we went over ten miles an· hour any place on the side-track.

"Q. I will ask you what would be a reasonably safe speed at which to run an engine over the track in the condition it was in that morning. A. Well, for the distance we had to go there, ten or twelve miles an hour was safe enough anywhere, if I had the signals when I ought to have had them.

"Q. You say the wind was blowing so that the sand falling from the end of the pipe never struck the rail, but blew off to one side? A. Yes, sir.

"Q. You say it takes but very little wind to blow the sand away? A. No, sir, it don't take a great deal.

"Q. You knew that the wind was blowing violently? A. Yes, sir; it was blowing terribly hard.

"Q. Did you run at the same speed in moving those cars that you would have run if it had been a bright, dry day, and the rails dry and clear? A. I don't know but that I did.

"Q. Where was McCally while you were passing from the western end of the side-track up to the box car? A. He was walking ahead of the engine, I think.

"Q. You knew that he coupled the engine on the box car? A. Yes, sir.

"Q. You knew after that was done he was somewhere ahead of the engine? A. I did not know where he was.

"Q. Did you see him after he coupled the engine to the box car? A. No, sir; the first time I saw him was when he was walking to the section house.

"Q. You were not looking after him? A. No, sir.

"Q. And you didn't care where he was? A. It didn't make any difference to me where he was.

"Q. It didn't make any difference to you whether you killed him or not? A. It was none of my·business where he was."

This testimony of Snyder clearly convicts him, as stated in the opinion, of reckless conduct and gross mismanagement. He stated that he was required to move his engine in accordance with the signals of the brakeman; yet he admitted that

with wet rails and a slick track, in a cold, windy and snowy day, prevented by the snow, wind and smoke from seeing any signals or receiving any orders from the brakeman, he ran his engine at the same rate of speed that he would have run it had the day been clear and bright and the rails dry.

Further, Snyder stated in his testimony that he did not think he was running over ten miles an hour at any place on the side-track. When asked if that was a reasonably safe speed at which to run his engine over the track in the condition it was in, the morning of the accident, he said, "Yes, if I had the signals when I ought to have had them." As the snow, wind and smoke prevented him from seeing the signals, even when properly given, his own testimony shows that he was not running his engine at a reasonably safe speed, as, according to his statement, he "did not see the signals." Not being able to see signals, it was inexcusable for him to run so fast. No wonder that young McCally said to Dr. Harrell when he was dying, that "the engineer was running back too fast, and it was his fault that he was hurt." The hearsay testimony which was admitted only tended to prove very slight negligence upon the part of Snyder. The testimony of Snyder, introduced by the railway company, proved very great negligence.

As to the opinion evidence of James Calloway, the only question or answer any way objectionable was as follows:

"Q. Whether or not was it [the pilot of the engine] the proper place for him [McCally] to stand in performing such service, in your judgment? A. It was."

The witness had already stated that the pilot of the engine was the usual place for brakemen in that yard in doing the service that McCally was engaged in. However incompetent this testimony may have been, (*Rly. Co. v. Peavey*, 29 Kas. 169,) we do not think as the case was tried, its admission sufficient ground for the reversal of the judgment. The railway company pursued a similar course of inquiry, and attempted to prove by several experienced railroad men that the pilot was not considered a safe place. The pilot beam in front of

the engine, upon which McCally was sitting at the time of the accident, was very carefully and fully described to the jury by various witnesses produced upon the trial; and therefore the opinion of one witness that it was "a proper place for a brakeman to be," when taken in connection with other testimony offered by the plaintiff below, that it was the usual place for brakemen doing such service as McCally was engaged in, could not have been very damaging or prejudicial. No motion was made to strike out the answer of the witness; and, as before stated, when the railway company came to its defense, it pursued a like course in introducing opinion testimony at great length.

Upon the argument, it was asserted that during the trial the jury were sent out to examine the engine, pilot, and pilot beam, and the manner of making a coupling. Such an inspection must have been much more satisfactory to the jury than the mere opinion of any or all of the witnesses.

Again, the answer of Calloway may be construed to mean merely that the proper place for McCally to stand while making the coupling between the box car and the engine, was upon the pilot. The testimony shows that a brakeman to make such a coupling had to get temporarily upon the pilot. If this was all that Calloway meant, the testimony was clearly harmless.

The former decision refers to the failure of the railway company to provide a switch engine, and the use by the deceased at the time of his injury, of an ordinary freight engine for switching. This was referred to not to establish negligence on the part of the railway company, but as tending to sustain the finding of the jury that the position in which McCally placed himself was not necessarily a dangerous one. If the company omitted to furnish a suitable switch engine, and McCally, from the structure of the engine, assumed the usual position it was customary for the brakemen in the yard using such engines to do, and the company suffered such use to be made of the pilot, or pilot beam, these matters were properly considered in deciding whether McCally voluntarily

chose such a dangerous position as would in law defeat any recovery for his death.

The other matters discussed in the briefs have been sufficiently disposed of in the opinion already filed.

The motion for a rehearing will be overruled.